# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH T. LYNN,** | : | |
| **Plaintiff** | : | |
| | : | **CIVIL ACTION NO. 3:09-0629** |
| v. | : | |
| | : | **(MUNLEY, D.J.)** |
| **ROBERT M. GATES, Secretary** | : | **(MANNION, M.J.)** |
| of the Department of Defense, | : | |
| **Defendants** | : | |
| | : | |

## REPORT AND RECOMMENDATION[1]

Pending before the court is defendant's motion for summary judgment. (Doc. No. 27). For the reasons set forth below, the court recommends that the motion be **GRANTED**.

## I.     PROCEDURAL BACKGROUND

Plaintiff Joseph T. Lynn, proceeding *pro se*, commenced this federal employment discrimination action by filing the instant complaint on April 6, 2009. (Doc. No. 1). The plaintiff, a former employee of the Defense Logistics Agency, alleges that he was unlawfully terminated because of his age, along with "managerial bureaucratic mass hysteria," in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§621-634. In

---

[1] For the convenience of the reader of this document in electronic format, hyperlinks to the court's record and to authority cited herein have been inserted. No endorsement of any provider of electronic resources is intended by the court's practice of using hyperlinks.

addition, he alleges gender discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. §2000e-16 ("Title VII"). *Id.* at 1-2. By way of relief, plaintiff is seeking to be reinstated in his position. In addition, he is seeking compensatory damages. *Id.* at 3.

On July 17, 2009, defendants filed an answer and a motion for partial judgment on the pleadings. (Doc. No. 13; Doc. No. 14). By order dated November 30, 2009, (Doc. No. 26), the district judge adopted the report of the undersigned recommending that the defendants' motion for partial judgment on the pleadings be granted, (Doc. No. 25). As a result, the only remaining defendant is Robert M. Gates, the Secretary of the Department of Defense. In addition, the plaintiff's claim for punitive damages was dismissed.

On February 16, 2010, the defendant filed the instant motion for summary judgment, (Doc. No. 27), along with a statement of facts, (Doc. No. 28), and supporting brief, (Doc. No. 29). On June 30, 2010, the plaintiff filed what is construed as a brief in opposition to the defendant's motion for summary judgment. (Doc. No. 30). On July 1, 2010, the defendant filed a reply brief. (Doc. No. 31). On July 6, 2010, the plaintiff filed an untimely response to the defendant's statement of facts. (Doc. No. 32).

II. **LEGAL STANDARD**

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

2

if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Supreme Court has stated that:

> ". . . [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Id. The moving party can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the evidence presented, could find for the nonmoving party." Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988)(citations omitted). Material facts are those which will effect the outcome of the trial under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court may not weigh the

evidence nor make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party. Id. at 393.

If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor. Id.

## III. DISCUSSION

In his complaint, the plaintiff alleges that he was wrongfully discharged from his job as a Defense Distribution Process Worker on July 27, 2005. The plaintiff alleges that he has a total of seven and one-half years of military supply and logistics experience. During those years, the plaintiff alleges that he always received "good" and "very good" evaluations from his supervisors. According to the plaintiff's complaint, the reasons for his discharge set forth in his discharge letter are "80% embellished." The plaintiff alleges that the real reason he was discharged is because of his age. He alleges that he was the only "silver haired" person fired and was age 58 at the time. He alleges that no younger people were terminated for reasons similar to those set forth in his letter of discharge.

In response to the plaintiff's allegations, the defendant has provided a

statement of material facts, which are deemed admitted[2]. These facts provide that the plaintiff is a former employee of the Defense Logistics Agency, ("DLA"), Defense Distribution Center, ("DDC"), Distribution Depot, Tobyhanna, Pennsylvania, ("DDTP").

In July of 2005, John Huber was the Occupational Safety, Health and Security Manager at DDTP. (Doc. No. 28, R.31). In that position, Huber would input data regarding DLA employee mishaps, near misses, alleged unsafe working conditions, and injuries to employees, which was inputted into a DLA database known as the Safety Health Information Reporting, ("SHIR"), system. (Id.) Moreover, if a DLA employee had an accident/incident at the work site, Huber would review the investigation of the incident, look at the factors that led up to the event, and make recommendations as to what, if any, follow-up actions should take place. (Id. at R.31-32). Huber, along with others, would also conduct surveillance at DDTP to ensure that DLA employees were properly performing their duties. If Huber observed something improper, he would prepare a DDTP Surveillance Report. (Id. at R.32). A copy of each Surveillance Report was given to the DDTP Site Manager. (Id. at R.32, R.38).

---

[2]In addition to filing his responsive statement of facts in an untimely manner, contrary to Local Rule 56.1, the plaintiff has failed to set forth any references to the record in support of his responses. Because the plaintiff has failed to properly controvert the defendant's statements, those statements are deemed admitted.

In July of 2005, Penny Graff was the Acting DDTP Site Manager and John Hopkins was the Alternate DDTP Site Manager. (Doc. No. 28, R.37). As Site Manager, Graff oversaw the workforce that was responsible for the receipt and distribution of materials to soldiers and other customers within the Department of Defense. (Id.).

In July of 2005, Yvonne MacNamara was the Commander of DDTP and John Heuberger was the Deputy Commander. (Doc. No. 28, R.34, R.43).

Effective July 11, 2005, the plaintiff was employed as a Distribution Process Worker at DDTP, with the plaintiff serving a one-year probation period. (Doc. No. 28, R.1, R.37, R.46). As a Distribution Process Worker, the plaintiff, among other things, was responsible for operating material handling equipment, ("MHE"), which would include forklifts and warehouse tractors, which are also known as "tugs" or "mules." (Id. at R.3-4, R. 37, R.43, R.62). The plaintiff, like all Distribution Process Workers, was required to operate material handling equipment safely and to follow all OSHA regulations, plus Tobyhanna Army Depot's safety requirements. (Id., at R.32, R.38, R.43).

Employees operating MHE must use a seatbelt at all times. This is a safety issue, with neither Graff nor Heuberger being aware of any exceptions to this requirement. (Doc. No. 28, R.38, R.44). It was also Huber's understanding that all employees operating MHE must use a seatbelt at all times and that this was required by both Tobyhanna safety rules and OSHA regulations. (Id. at R.32).

On or about July 12 or 13, 2005, the plaintiff was late for roll call while he went to get coffee. (Doc. No. 28, R.38, R.68).

On the morning of July 12, 2005, Huber saw the plaintiff driving a forklift to unload pallets from a mule with his seatbelt unfastened. Huber informed Graff of this. (Doc. No. 28, R.33, R.38, R.60-61, 66, 67).

Also on July 12, 2005, Nance Rice, the Transportation Supervisor, sent Huber and Walter Rosati, the DDTP Accountable Officer, an e-mail stating that the plaintiff had been driving his forklift with the forks in an elevated position, instead of having his forks close to the ground, which is a safety matter. (Doc. No. 28, R.7, R.33, R.39).

As a result of Huber's earlier observation of the plaintiff's failure to use his seatbelt and Rice's e-mail, on July 12, 2005, Huber completed a DDTP Surveillance Report noting both of these unsafe operations. (Doc. No. 28, R.8, R.33, R.60-61). Graff received a copy of this report. (Id. at R.8, R.39, r.57).

On July 19, 2005, Huber observed the plaintiff driving a forklift without using his seatbelt and prepared a DDTP Surveillance Report, which Graff received. Huber also informed Graff of this via a July 19, 2005, e-mail. (Doc. No. 28, R.9, R.11, R.33, R.39, R.57, R.61).

On July 20, 2005, an employee who asked to remain anonymous, informed Huber that he/she had observed three incidents of the plaintiff striking and knocking down items, specifically racks and drums, while he was

driving a mule in Warehouse 2. Huber reported this information in a July 20, 2005, e-mail to Graff and Hopkins. (Doc. No. 28, R.12, R.33, R.39).

On the morning of July 21, 2005, an employee, Ms. Williams, reported to Huber that the plaintiff had driven a mule through an "exit" door, rather than the entrance door in Warehouse 2, and had hit an Army mule with trailers dragging them a short distance. Huber reported this incident on a DDTP Surveillance Report. (Doc. No. 28, R.14, R.15-17, R.34).

Also on the morning of July 21, 2005, in Warehouse 1B-5, Huber observed the plaintiff hit a protective yellow bollard which protected the plastic wrapping area with his forklift. (Doc. No. 28, R.18, R.34, R.62, R.63-64, R.66-67, R.70). The plaintiff bent the bollard and pulled the mounting bolts out of the concrete. (Id. at R.18, R.19, R.20-23, R.34).

As a result of the two incidents on July 21, 2005, Huber sent an e-mail to Graff and Hopkins and copied Commander MacNamara and Deputy Commander Heuberger. Huber informed them of both accidents and reminded them of the plaintiff's violations and mishaps. (Doc. No. 28, R.13, R.34, R.39, R.44). Huber informed management in his e-mails that OSHA Regulation 29 C.F.R. §1910.178(1)(4) and its subparagraphs, required the plaintiff to be removed from operating MHE and to undergo refresher training. As such, Huber recommended that the plaintiff be removed from operating MHE and that if they determined that the plaintiff should continue to operating MHE, that he first successfully complete refresher training. (Id. at R.13, R.35,

R.39). This recommendation was based upon the plaintiff's various safety violations and mishaps that Huber had observed or had been informed of, and had nothing to do with the plaintiff's age nor sex. (Id. at 23).

In addition to receiving Huber's July 21, 2005, e-mail, Graff also received a copy of Huber's Surveillance Report regarding the mule striking the Army mule incident and a copy of Huber's Surveillance Report regarding the forklift/bollard accident. (Doc. No. 28, R.15, R.40). Graff also received or saw copies of the photographs of the damaged bollard and the plaintiff's forklift. (Id. at R.20-23, R.40).

Based upon the plaintiff's tardiness, breach of safety regulations, and his mishaps that damaged government property, all in a period of less than two weeks since he started his employment, Graff thought that the plaintiff should be terminated from his position during his probationary period. (Doc. No. 28, R.40). Graff contacted Human Relations and informed them of the incidents the plaintiff had, indicated that she believed the plaintiff should be terminated, and sought their guidance. Graff was advised that they concurred and that termination was appropriate. (Id. at R.40). Graff also discussed with Deputy Commander Heuberger that she would be proposing the plaintiff's termination. (Id. at R.40, R.44).

In the interim, on July 25, 2005, Graff observed the plaintiff at the cafeteria when he was supposed to be working at his assigned duty station. (Doc. No. 28, R.40, R.56-57).

9

On July 26, 2005, the plaintiff was involved in another mishap in Warehouse 8-3, where he attempted to carry two 125-pound power distribution units side-by-side on a forklift and then dropped them. The units landed in the computer workstation area with an employee being nearby at the time. (Doc. No. 28, R.35, R.59, R.62-63, R.66-67, R.70, R.71-72, R.74). Graff and Deputy Commander Heuberger were informed of the incident on the same day. (Id. at R.24, R.25-26, R.35, R.41, R.44). Graff and Deputy Commander Heuberger discussed this incident and determined that the plaintiff should be removed from employment immediately and a termination letter drafted. (Id. at R.41, R.44). Deputy Commander Heuberger forwarded a draft letter terminating the plaintiff's employment to Karen Doyle of Human Relations that same day for her review. (Id., at R.27, R.41, R.44). In the e-mail which accompanied the draft letter, Deputy Commander Heuberger stated that he would like to have the plaintiff off of the rolls by the end of the day before he killed someone or himself. (Id. at R.27, R.45). The defendant's materials provide that Deputy Commander Heuberger's request for immediate termination was based solely on the plaintiff's repeated safety violations, the damage to Government material that resulted from his actions, and his concern for his and his fellow DDTP workers' safety. (Id. at R.45).

On July 26, 2005, Doyle reviewed the termination letter and approved it. (Doc. No. 28, R.41, R.44, R.46). Doyle determined that the plaintiff's termination as a probationary employee due to the incidences occurring

10

during his employment between July 11, 2005, and July 26, 2005, was proper and was a rather straight-forward case. (Id. at R.47). Doyle was not aware of any information reflecting anything that the plaintiff's termination was due to his age or sex. Her approval of the termination letter was based upon the incidents contained within the letter, which she believed to be true, and not due to the plaintiff's age or sex. (Id. at R.47).

On July 27, 2005, Graff gave the plaintiff the termination letter with his termination effective that day. (Doc. No. 28, R.28-29, R.30, R.41).

The defendant's materials provide that Graff's actions in recommending the plaintiff's termination were based upon what she had personally observed, such as his tardiness, or what others had observed or reported about the plaintiff's various safety violations and mishaps between July 11, 2005, and July 26, 2005, which she believed to be true. None of her actions were taken because of the plaintiff's age or sex. (Doc. No. 28, R. 41). In fact, the defendant's materials provide that Graff has terminated other probationary employees who have not met the standards of conduct. One individual was a fifty-five year-old male who would not show up or call in, or would leave early and who slept on the job, and another individual was a twenty-seven year-old female who was frequently late, took a lot of leave, and also slept on the job. (Id. at R.42).

Deputy Commander Heuberger's actions and involvement in the plaintiff's termination was due to the plaintiff's non-conforming actions or

attitudes, including his various safety violations and mishaps occurring between July 11, 2005, and July 26, 2005, which he believed to be true. None of his actions were taken because of the plaintiff's age or sex. (Doc. No. 28, R.45).

The defendant's materials provide that neither Graff nor Deputy Commander Heuberger are aware of any probationary employee who has had a similar history of safety violations and mishaps as the plaintiff who was not terminated. (Doc. No. 28, R.42, R.45).

In light of the above facts, the defendant argues that he is entitled to summary judgment on the plaintiff's age and gender discrimination claims because the facts establish that DDTP terminated the plaintiff for legitimate, nondiscriminatory reasons and the plaintiff cannot prove pretext. (Doc. No. 29, pp. 9-14).

In the instant case, the plaintiff has not provided direct evidence of either age or gender discrimination[3]. As such, the court will examine his claims using the three step burden-shifting analysis set forth in McDonnell

---

[3]Direct evidence is "evidence that proves an ultimate fact in the case without any process of inference." Woodson v. Scott Paper Co., 109 F.3d 913, 930 (3d. Cir. 1997). An employer who discriminates "will almost never announce a discriminatory animus or provide employees or courts with direct evidence of discriminatory intent." Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999). Therefore, a plaintiff who wishes to establish a *prima facie* case of discrimination using direct evidence "faces a high hurdle." Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998).

Douglas[4].

Under McDonnell Douglas, the plaintiff must first establish a prima facie case of discrimination by proving the following elements: (1) the plaintiff is a member of a protected class, (2) the plaintiff was qualified for the position he held or sought, (3) the plaintiff suffered an adverse employment action, and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. Johnson v. Keebler-Sunshine Biscuits, Inc., 214 Fed.App'x 239, 241 (3d Cir. 2007)(citing Jones v. School Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999)); Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 (3d Cir. 1998).

Once the plaintiff's *prima facie* case is established, the burden shifts to the defendant to articulate some "legitimate, nondiscriminatory reason" for the plaintiff's treatment. Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999) (citing McDonnell Douglas, 411 U.S. at 802); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997). The defendant's burden to prove a legitimate non-discriminatory reason is "relatively light." Johnson, 2007 WL 215801, at *3. The defendant is only required to prove that the actions could

---

[4]The court notes that the analytical framework for discrimination cases brought under the ADEA and Title VII are identical. See Heilman v. Allegheny Energy Serv. Corp., 351 Fed. Appx. 645, 647 (3d Cir. 2009) (citations omitted) (addressing a discrimination claim under the ADEA and stating that the analytical framework for discrimination cases lodged under the ADEA and Title VII are identical).

13

have been motivated by the proffered legitimate, nondiscriminatory reason; proof of actual causation is not required. Iadimarco, 190 F.3d at 157.

Once the defendant has met his burden, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant is merely pretext for discrimination." Johnson, 2007 WL 215801, at *2. In order to create a genuine issue of material fact as to whether the defendant's proffered reasons are pretextual, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the defendants' articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the defendants' action." Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006)(citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). The plaintiff must do more than show that the defendant was "wrong or mistaken" in terminating him. Id. (citing Fuentes, 32 F.3d at 765)). The plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for [his] action[s] that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the [defendant] did not act for [the asserted] non-discriminatory reasons.'" Id. (citing Fuentes, 32 F.3d at 765 (footnote omitted) (citations omitted)).

In this case, the court will assume that the plaintiff has established a

*prima facie* case because the defendant has offered no evidence to challenge such a finding[5]. The defendant argues that he has offered legitimate, non-discriminatory reasons for the plaintiff's termination. Specifically, the defendant states that, within two and one-half weeks of beginning his probationary employment, the plaintiff had been tardy, failed to wear his seatbelt, and had been involved in a number of accidents and mishaps while driving a forklift or mule. The court agrees that the defendant has met his light burden of setting forth legitimate, non-discriminatory reasons for the plaintiff's termination.

For his part, the plaintiff has brought forth <u>no</u> evidence to establish that the defendant's proffered reasons were pretextual. In response to the defendant's motion for summary judgment, the plaintiff simply claims that the information provided by the defendant is false and constitutes "fiction." He admits that he was tardy on one occasion and that he was involved in the three incidents cited by the defendant, but disagrees that these incidents warranted any type of disciplinary action. With no evidence to call into doubt

---

[5] The defendant's brief in support of summary judgment merely states, "Assuming Lynn could establish a *prima facia* case of sex or age discrimination, which the government does not concede, DDTP has established legitimate, non discriminatory reasons why it terminated Lynn." (Doc. No. 29, p. 12). However, the defendant has offered no factual or evidentiary argument to show how or why a *prima facia* case has not been established. Rather, they have moved directly to step 2 of the analysis by arguing that there is no pretext.

the defendant's proffered reasons for termination, the plaintiff has failed to meet his burden.

On the basis of the foregoing, **IT IS RECOMMENDED THAT:** the defendant's motion for summary judgment, **(Doc. No. 27)**, be **GRANTED**.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION
United States Magistrate Judge**

**Date:** August 17, 2010
O:\shared\REPORTS\2009 Reports\09-0629-02.wpd